## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| MOHAMAD TLAIB, on behalf of himself and all others similarly situated, | **AMENDED CLASS ACTION COMPLAINT** |
| Plaintiff, | **JURY TRIAL DEMANDED** |
| v. | Case No.: 23-CV-13840 |
| PROCTER & GAMBLE COMPANY, | |
| Defendant. | |

Plaintiff, Mohamad Tlaib, on behalf of himself and all others similarly situated, brings this class action against Defendant, Procter & Gamble Company ("P&G"), and allege on personal knowledge, investigation of counsel, and on information and belief as follows:

### GENERAL ALLEGATIONS

1.      P&G offers a variety of over-the-counter drugs, including oral nasal decongestants, competing in a billion-dollar industry. Such products include the over-the-counter oral nasal decongestants and pain relievers/fever reducers under the brand name Vicks ("Products").

2.      All of the Products are oral phenylephrine hydrochloride ("PE") nasal decongestant syrups, pills, or powders, some contain acetaminophen as another active ingredient, and all the Products are marketed as "MAX STRENGTH" ("Maximum Strength Representation").

3.      When consumers purchase decongestants and pain relief/fever reducer pills, the strength of the ingredients is an important purchasing consideration, especially for consumers seeking a maximum strength product.

4.      P&G takes advantage of this consumer preference for strong relief by prominently representing the alleged strength of the Products in the one place every consumer looks when

purchasing a product—the front packaging.

      5.      On each product package for the Products, P&G uniformly touts in capitalized, font set against a contrasting color background on the front of the package the Products provide maximum strength relief.

      6.      The Products that contain PE and/or acetaminophen include: DayQuil MAX STRENGTH Severe Cold & Flu; NyQuil MAX STRENGTH Severe Cold & Flu, DayQuil/NyQuil DayQuil/NyQuil MAX STRENGTH Hot Remedy Cold & Flu Relief Hot Drink Powder Medicine; DayQuil MAX STRENGTH VapoCool Severe Cold & Flu + Congestion; NyQuil MAX STRENGTH VapoCool Severe Cold & Flu + Congestion; and DayQuil Ultra Concentrated MAX STRENGTH Cold and Flu Relief.[1] They are marketed as maximum strength relief for Headache, Fever, Sore Throat, Minor Aches & Pains, Nasal Congestion, and Sinus Pressure.

---

[1] Based upon reasonable investigation, Plaintiff has identified certain Products that contain PE, and at times, acetaminophen, and are also labeled as "MAX STRENGTH." The complete list of Products is in the exclusive control of P&G and will be the subject of discovery. Products include all substantially similar Vicks products, manufactured, marketed, and sold during the relevant class periods, that contained PE and acetaminophen were labeled as "MAX STRENGTH" or another synonymous Maximum Strength Representation, including "MAXIMUM STRENGTH."





3





4







## Drug Facts

| Active ingredients (in each 30 mL) | Purpose |
|---|---|
| Acetaminophen 650 mg | Pain reliever/fever reducer |
| Dextromethorphan HBr 20 mg | Cough suppressant |
| Guaifenesin 400 mg | Expectorant |
| Phenylephrine HCl 10 mg | Nasal decongestant |

### Uses
- temporarily relieves common cold/flu symptoms:
  - nasal congestion • sinus congestion & pressure
  - cough due to minor throat & bronchial irritation
  - minor aches & pains • headache • fever • sore throat
  - reduces swelling of nasal passages
  - temporarily restores freer breathing through the nose
  - promotes nasal and/or sinus drainage
- helps loosen phlegm (mucus) and thin bronchial secretions to rid the bronchial passageways of bothersome mucus and make coughs more productive.

### Warnings
**Liver warning:** This product contains acetaminophen. Severe liver damage may occur if you take
- more than 4 doses in 24 hrs, which is the maximum daily amount for this product
- taken with other drugs containing acetaminophen
- 3 or more alcoholic drinks every day while using this product

**Allergy Alert:** Acetaminophen may cause severe skin reactions. Symptoms may include:
- skin reddening • blisters • rash
If a skin reaction occurs, stop use and seek medical help right away
**Sore throat warning:** If sore throat is severe, persists for more than 2 days, is accompanied or followed by fever, headache, rash, nausea, or vomiting, consult a doctor promptly.

**Do not use**
- with any other drug containing acetaminophen (prescription or nonprescription). If you are not sure whether a drug contains acetaminophen, ask a doctor or pharmacist.
- if you are now taking a prescription monoamine oxidase inhibitor (MAOI) (certain drugs for depression, psychiatric or emotional conditions, or Parkinson's disease), or for 2 weeks after stopping the MAOI drug. If you do not know if your prescription drug contains an MAOI, ask a doctor or pharmacist before taking this product.
- a sodium-restricted diet

**Ask a doctor or pharmacist before use if you are** taking the blood thinning drug warfarin.
**When using this product, do not use more than directed.**
**Stop use and ask a doctor if**
- you get nervous, dizzy or sleepless

**Ask a doctor before use if you have**
- liver disease • heart disease
- high blood pressure • thyroid disease
- diabetes
- trouble urinating due to enlarged prostate gland
- cough that occurs with too much phlegm (mucus)
- persistent or chronic cough such as occurs with smoking, asthma, chronic bronchitis, or emphysema
- pain, nasal congestion, or cough gets worse or lasts more than 7 days
- fever gets worse or lasts more than 3 days
- redness or swelling is present
- new symptoms occur
- cough comes back or occurs with rash or headache that lasts. These could be signs of a serious condition.

**If pregnant or breast-feeding,** ask a health professional before use. **Keep out of reach of children.** In case of overdose, get medical help or contact a Poison Control Center right away. Quick medical attention is critical for adults as well as for children even if you do not notice any signs or symptoms.

### Directions
- take only as directed
- only use the dose cup provided
- do not exceed 4 doses per 24 hrs

| adults & children 12 yrs & over | 30 mL every 4 hrs |
|---|---|
| children 4 to under 12 yrs | ask a doctor |
| children under 4 yrs | do not use |

### Other information
- each 30 mL contains: sodium 81 mg
- store at no greater than 25°C and do not refrigerate

**Inactive ingredients** alcohol, citric acid, D&C Yellow No. 10, FD&C Blue No. 1, flavor, glycerin, propylene glycol, purified water, saccharin sodium, sodium benzoate, sodium chloride, sodium citrate, sorbitol, sucralose



**Drug Facts**

| Active ingredients (in each 30 mL) | Purpose |
|---|---|
| Acetaminophen 650 mg | Pain reliever/fever reducer |
| Dextromethorphan HBr 20 mg | Cough suppressant |
| Doxylamine succinate 12.5 mg | Antihistamine |
| Phenylephrine HCl 10 mg | Nasal decongestant |

**Uses** temporarily relieves common cold/flu symptoms:
- nasal congestion
- sinus congestion & pressure
- cough due to minor throat & bronchial irritation
- cough to help you sleep
- minor aches & pains
- headache
- fever
- sore throat
- runny nose & sneezing
- reduces swelling of nasal passages
- temporarily restores freer breathing through the nose
- promotes nasal and/or sinus drainage

**Warnings**
**Liver warning:** This product contains acetaminophen. Severe liver damage may occur if you take
- more than 4 doses in 24 hours, which is the maximum daily amount for this product
- with other drugs containing acetaminophen
- 3 or more alcoholic drinks every day while using this product

**Allergy Alert:** Acetaminophen may cause severe skin reactions. Symptoms may include:
- skin reddening
- blisters
- rash
If a skin reaction occurs, stop use and seek medical help right away

**Sore throat warning:** If sore throat is severe, persists for more than 2 days, is accompanied or followed by fever, headache, rash, nausea, or vomiting, consult a doctor promptly.

**Do not use**
- with any other drug containing acetaminophen (prescription or nonprescription). If you are not sure whether a drug contains acetaminophen, ask a doctor or pharmacist.
- if you are now taking a prescription monoamine oxidase inhibitor (MAOI) (certain drugs for depression, psychiatric or emotional conditions, or Parkinson's disease), or for 2 weeks after stopping the MAOI drug. If you do not know if your prescription drug contains an MAOI, ask a doctor or pharmacist before taking this product.

**Ask a doctor before use if you have**
- liver disease
- heart disease
- high blood pressure
- thyroid disease
- diabetes
- glaucoma
- cough that occurs with too much phlegm (mucus)
- a breathing problem or chronic cough that lasts or as occurs with smoking, asthma, chronic bronchitis, or emphysema
- trouble urinating due to enlarged prostate gland
- a sodium-restricted diet

**Ask a doctor or pharmacist before use if you are**
- taking sedatives or tranquilizers
- taking the blood thinning drug warfarin

**When using this product**
- do not use more than directed
◄

**Drug Facts** (continued)

- excitability may occur, especially in children
- marked drowsiness may occur
- avoid alcoholic drinks
- be careful when driving a motor vehicle or operating machinery
- alcohol, sedatives, and tranquilizers may increase drowsiness

**Stop use and ask a doctor if**
- you get nervous, dizzy or sleepless
- pain, nasal congestion, or cough gets worse or lasts more than 7 days
- fever gets worse or lasts more than 3 days
- redness or swelling is present
- new symptoms occur
- cough comes back or occurs with rash or headache that lasts.
These could be signs of a serious condition.

**If pregnant or breast-feeding,** ask a health professional before use. **Keep out of reach of children.** In case of overdose, get medical help or contact a Poison Control Center right away. Quick medical attention is critical for adults as well as for children even if you do not notice any signs or symptoms.

**Directions**
- take only as directed
- only use the dose cup provided
- do not exceed 4 doses per 24 hrs

| adults & children 12 yrs & over | 30 mL every 4 hrs |
|---|---|
| children 4 to under 12 yrs | ask a doctor |
| children under 4 yrs | do not use |

**Other information**
- each 30 mL contains: sodium 81 mg
- store at no greater than 25°C and do not refrigerate

**Inactive ingredients** alcohol, citric acid, D&C Yellow No. 10, FD&C Blue No. 1, flavor, glycerin, propylene glycol, purified water, saccharin sodium, sodium benzoate, sodium chloride, sodium citrate, sorbitol, sucralose





7.      Reasonable consumers understand the Maximum Strength Representations to mean that the Products are the strongest over-the-counter nasal decongestant and pain reliever/fever reducers.

8.      Therefore, P&G's labeling of the Products with a Maximum Strength Representation misleads reasonable consumers.

9.      P&G knew the active nasal decongestant ingredient, PE, was not as strong as other over-the-counter oral nasal decongestants available to consumers and, therefore, not suitable for a maximum strength representation. Additionally, the Products do not even contain the maximum dosage of acetaminophen and are thus not deserving of the "MAX STRENGTH" label and representation.

10.     Thus, this maximum strength packaging is misleading because nasal decongestants that are actually stronger—without the maximum strength claim—are available over the counter. For example, both oxymetazoline and pseudoephedrine are available over the counter.

11.     Further, P&G knew higher doses of acetaminophen exist on the market. The Court need look no further than the common manufacturing and marketing of acetaminophen products as "Regular Strength" for 325 mg and "Extra Strength" for 500 mg capsules, tablets, and gelcaps, taken, as with the Products, in dosages of two each. For liquid Products at issue, the dosage is 650 mg.

12.     Despite this knowledge, P&G chose to mislead consumers through its labeling of the Products, with and without acetaminophen, as "MAX STRENGTH" decongestants and/or pain relievers/fever reducers. However, none of the Products are maximum strength. Consumers, including Plaintiff, lack the scientific knowledge necessary to determine whether the Products are maximum strength decongestants and pain relievers/fever reducers, or to ascertain the true quality

or strength of these Products. For that reason, reasonable consumers must and do rely on manufacturers, like P&G, to be honest and transparent and to properly disclose on the packaging all material information regarding the Products and strength.

13.     Rather than being honest and transparent, P&G makes the Maximum Strength Representation in a knowingly false, misleading, and deceptive manner.

14.     For all the reasons set forth herein, including, but not limited to, P&G's misrepresentations and omissions regarding its maximum strength claims, Plaintiff seeks relief in this action individually, and as a class action on behalf of similarly situated purchasers of P&G's Products, for: (1) violation of State consumer protection laws; (2) unjust enrichment, and (3) breach of express and implied warranties.

## THE PARTIES

15.     Plaintiff is a citizen of Illinois, residing in the Village of Orland Hills, within Cook County. He purchased Nyquil MAX STRENGTH Severe Cold and Flu within the applicable statute of limitations period, most recently in November 2022 at a Walgreens near his home in Orland Hills, Illinois.

16.     P&G is a corporation with its principal place of business in Ohio.

## JURISDICTION AND VENUE

16.      This Court has personal jurisdiction over P&G in this matter. The acts and omissions giving rise to this action occurred in the state of Illinois. P&G has been afforded due process because it has, at all times relevant to this matter, individually or through its agents, subsidiaries, officers and/or representatives, operated, conducted, engaged in and carried on a business venture in this state and/or maintained an office or agency in this state, and/or marketed, advertised, distributed and/or sold the Products in this state, committed a statutory violation within

this state related to the allegations made herein, and caused injuries to Plaintiff and the putative

class members, which arose out of the acts and omissions that occurred in the state of Illinois,

during the relevant time period, at which time P&G was engaged in business activities in the state

of Illinois.

17.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C.§

1332 of the Class Action Fairness Act of 2005 because: (i) there are 100 or more putative class

members, (ii) the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and

costs, and (iii) there is minimal diversity because at least one Plaintiff and P&G are citizens of

different states.

18.     Pursuant to 28 U.S.C. § 1391(a), venue is proper because a substantial part of the

events giving rise to the claims asserted occurred in this District. Venue is also proper pursuant to

28 U.S.C. § 1391(c) because P&G conducts substantial business in this District, has sufficient

minimum contacts with this District, and otherwise purposely avails itself of the markets in this

District, through the promotion, sale, and marketing of the Products in this District. Furthermore,

Plaintiff resides in this District.

**<u>FACTS COMMON TO ALL CLASS MEMBERS</u>**

20.     P&G is one of the largest drug manufacturing companies in the world. As such,

P&G sells several over-the-counter drugs, including the "Robitussin," "Theraflu," and "Contac"

branded lines of products.

21.     PE is the oral active ingredient in the Products for nasal decongestion.

Acetaminophen is the active ingredient in the Products that are the subject of this action as a pain

reliever/fever reducer. When included, both form the basis for P&G's Maximum Strength

Representation on the Products' packaging, and overall advertising and marketing campaign.

11

22.     At all relevant times, P&G has marketed the Products in a consistent and uniform manner nationwide.

23.     As alleged above, the Robitussin Products represent that they are "MAX STRENGTH," which representations prominently appear on the front label of the Robitussin Products in capitalized, white font set against a red background that contrasts with the background of the packaging. This instantly catches the eye of all reasonable consumers, including Plaintiff and class members.

24.     A reasonable consumer would understand that "MAX STRENGTH" means the Products contained the strongest nasal decongestant available on the over-the-counter market, as well as the strongest dose of acetaminophen for pain relief/fever reducer, where applicable.

25.     All reasonable consumers, including Plaintiff, read and relied on P&G's "MAX STRENGTH" representations when purchasing the Products. Indeed, when purchasing pharmaceuticals, especially those promising to be maximum strength, consumers look for a product with the strongest active ingredients available and are willing to pay a premium for them.

26.     P&G's Maximum Strength Representation was material to Plaintiff' and class members' decision to purchase the Products. Had consumers, such as Plaintiff, known the Products were not "MAX STRENGTH," because stronger over-the-counter alternatives existed, they would not have purchased the Products or would have paid less.

27.     P&G's marketing efforts are made in order to—and do in fact—induce consumers to purchase the Products at a premium because consumers believe they are getting maximum strength decongestants. This deceives reasonable consumers into believing PE nasal decongestants are maximum strength when they are not.

28.     P&G, however, has at all relevant times been well aware that its Products are not

maximum strength nasal decongestants, as other, stronger nasal decongestants are available with stronger active ingredients, such as pseudoephedrine, over the counter.

29.     Reliable scientific studies undermine PE's effectiveness when compared to other nasal decongestants, thus rendering its Maximum Strength Representation false and misleading in the face of such evidence, and no reasonable consumer would deem the Products maximum strength.

30.     Regardless of a handful of clinical studies addressing PE's efficacy, PE's effectiveness has been questioned when compared to other over-the-counter nasal decongestants.

31.     "Intervention studies can be placed on a continuum, with a progression from efficacy trials to effectiveness trials. Efficacy can be defined as the performance of an intervention under ideal and controlled circumstances, whereas effectiveness refers to its performance under 'real world' conditions."[2]

32.     Further, comparative studies in drugs are designed to improve the health care decisions by providing evidence regarding effectiveness, benefits, and harms of different treatments.[3]

33.     In 2006, the authors of a research comparative letter to the editor of a scientific journal found pseudoephedrine superior to PE in reducing nasal congestion, attributing the ineffectiveness to poor bioavailability of PE.[4]

34.     Also, in 2009, a comparison effectiveness study was done on PE and

---

[2] *See* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3912314/. Last visited December 19, 2023.
[3]     *See*     https://tracs.unc.edu/index.php/services/comparative-effectiveness-research/what-is-cer#:~:text=Comparative%20effectiveness%20research%20is%20designed,harms%20of%20different%20treatment%20options. Last visited December 19, 2023.
[4]     *See*     https://www.jacionline.org/action/showPdf?pii=S0091-6749%2806%2900633-6.     Last visited December 19, 2023.

13

pseudoephedrine. The authors found that pseudoephedrine was far more effective on the measures of nasal congestion than PE.[5]

35.     Further, the Maximum Strength Representation on the Products' labels is misleading for yet another reason. The only active ingredient for pain relief/fever reducer is 325 mg of acetaminophen, which is the equivalent of a "Regular Strength" acetaminophen tablet. Thus, the strength of the acetaminophen dosage is far below anything that can be considered "MAX STRENGTH," or as acetaminophen is commonly marketed as "Extra Strength."

36.     P&G intended for Plaintiff and class members to be deceived or misled by its misrepresentations and omissions. Indeed, label space is limited, so manufacturers only place the most pertinent information on the front label. P&G specifically labeled and marketed the Products as Maximum Strength when other oral nasal decongestants and pain relievers/fever reducers were not marketed in a similar fashion.

37.     P&G's deceptive and misleading practices proximately caused harm to Plaintiff and the Classes.

38.     Plaintiff and class members would not have purchased the Products, or would have paid less for them, had they known the truth about the mislabeled and falsely advertised products. Indeed, other, stronger nasal decongestants and higher acetaminophen doses are available.

**PLAINTIFF'S FACTUAL ALLEGATIONS**

39.     Plaintiff relied on the "MAX STRENGTH" label in deciding to purchase what they believed to be the strongest nasal decongestant over the counter. Had Plaintiff known that PE, the only active oral nasal decongestant ingredient in the Products, is not the maximum strength nasal decongestant available over the counter, they would not have purchased it or would have paid less.

---

[5] *See* https://pubmed.ncbi.nlm.nih.gov/19230461/. Last visited December 19, 2023.

Further, had they known the acetaminophen in the Products was not the maximum dosage available, they would not have purchased it or would have paid less.

40.     Plaintiff resides in Village of Orland Hills, Illinois and is a citizen of Illinois. Throughout the relevant period, Plaintiff purchased certain of the Products at issue in this lawsuit and was exposed to, and reasonably relied upon, P&G's Maximum Strength Representations. For example, Plaintiff purchased NyQuil MAX STRENGTH Severe Cold and Flu as recently as November of 2022 from Walgreens located at 8400 171st St, Tinley Park, Illinois 60487. At the time of purchase, Plaintiff reviewed the Product packaging, including the front-label "MAX STRENGTH" representation, and reasonably believed from these representations that the Products were maximum strength. Those terms meant to Plaintiff that no stronger alternative over-the-counter nasal decongestant and pain reliever/fever reducer existed. In reasonable reliance on these representations, Plaintiff paid a premium cost for the Products, which were worth less than represented because the statements were not true and were highly misleading. The "MAX STRENGTH" representation on the Products' packaging was part of the basis of the bargain in that Plaintiff attributed value to those representations and Plaintiff would not have purchased the Products, or would not have purchased them on the same terms, if he knew the Maximum Strength Representations were untrue and/or misleading. Plaintiff paid a price premium for empty promises that P&G did not keep. Had Plaintiff been aware that the Maximum Strength Representations made on the Products was untrue, he would have paid less for the Products, or would not have purchased them at all.

## FED. R. CIV. P. 9(B) ALLEGATIONS

41.     P&G made material misrepresentations and/or omissions of fact in its labeling and marketing of the Products by representing that they are "MAX STRENGTH" decongestant and

pain relief/fever reducer products.

42.   P&G's alleged conduct was and continues to be fraudulent because it has the effect of deceiving consumers into believing the Products are maximum strength oral nasal decongestant products. P&G omitted from Plaintiff and class members that the Products are not maximum strength oral nasal decongestant products because other stronger over-the-counter nasal decongestant products exist. P&G knew or should have known this information is material to all reasonable consumers and impacts consumers' purchasing decisions. Yet, P&G has and continues to represent the Products are maximum strength oral nasal decongestant products when they are not and has omitted from the Products' packaging the fact that there are other over-the-counter products that are stronger decongestants. P&G has likewise continued to label the Products as maximum strength with respect to pain relief/fever reducer, even though their acetaminophen content is only regular strength.

43.   P&G made material misrepresentations and/or omissions detailed herein, including that the Products are maximum strength oral nasal decongestant and pain reliever/fever reducer, continuously throughout the applicable class period(s).

44.   P&G's material misrepresentations and omissions, that the Products are maximum strength oral nasal decongestant and pain reliever/fever reducer products, were located on the front label of the Products in capitalized, bold lettering that contrasts with the background of the packaging, which instantly catches the eye of all reasonable consumers, including Plaintiff and class members, at the point of sale in every transaction. The Products are sold in brick-and-mortar stores and online stores in Illinois and nationwide.

45.   P&G made written misrepresentations of fact on the front label of the Products that they were "MAX STRENGTH" even though other stronger nasal decongestant and body pain

16

reliever/fever reducer products are available. As such, P&G's Maximum Strength Representations are false and misleading. Moreover, P&G omitted from the Products' labeling the fact that there are stronger over-the-counter nasal decongestants and pain relievers/fever reducers available. And as alleged in detail throughout this Complaint, Plaintiff and class members read and relied on P&G's Maximum Strength Representations and omissions before purchasing the Products.

46.     P&G misrepresented its Products as being maximum strength nasal decongestant and pain reliever/fever reducer and omitted from the Products' labeling the fact that there are other, over-the-counter products available that are stronger decongestants and pain relievers/fever reducers, for the express purpose of inducing Plaintiff and class members to purchase the inferior PE and acetaminophen products at a price premium. As such, P&G profited by selling the misrepresented products to at least thousands of consumers throughout the nation.

## CLASS ACTION ALLEGATIONS

47.     Plaintiff brings this action on behalf of himself and the following "Classes" pursuant to Federal Rule of Civil Procedure 23(a), (b)(2) and/or (b)(3). Specifically, the Classes are defined as:

**Nationwide Class**: All persons in the United States who purchased one or more of the Products in the United States for personal use and not for resale during the applicable statute of limitations period, until the date notice is disseminated.

**Illinois Subclass**: All persons in the State of Illinois who purchased one or more of the Products in the State of Illinois for personal use and not for resale during the applicable statute of limitations period, until the date notice is disseminated.

**Multi-State Consumer Protection Class:** All persons who purchased in the State of Illinois or any state with similar laws[6] one or more of the Products, within the

---

[6] While discovery may alter the following, Plaintiff asserts that the other states with similar consumer fraud laws under the facts of this case include, but are not limited to: California (Cal. Bus. & Prof. Code § 17200, *et seq*.); Florida (Fla. Stat. §§ 501.201, *et seq*.); Illinois (815 ICLS §§ 505/1, *et seq*.); Massachusetts (Mass. Gen. Laws Ch. 93A, *et seq*.); Michigan (Mich. Comp. Laws §§ 445.901, *et seq*.); Minnesota (Minn. Stat. §§ 325F.67, *et seq*.); New Jersey (N.J. Stat. §§ 56:8-

applicable statute of limitations, until the date notice is disseminated.

48.     Excluded from the Classes are (a) any person who purchased the Products for resale and not for personal or household use, (b) any person who signed a release of P&G in exchange for consideration, (c) any officers, directors or employees, or immediate family members of the officers, directors or employees, of P&G or any entity in which a P&G has a controlling interest, (d) any legal counsel or employee of legal counsel for P&G, and (e) the presiding Judge in this lawsuit, as well as the Judge's staff and their immediate family members.

49.     Plaintiff reserves the right to amend the definition of the Classes if discovery or further investigation reveals that the Classes should be expanded or otherwise modified.

50.     **Numerosity – Federal Rule of Civil Procedure 23(a)(1).** Class members are so numerous and geographically dispersed that joinder of all class members is impracticable. While the exact number of class members remains unknown at this time, upon information and belief, there are thousands, if not hundreds of thousands or millions, of putative class members.

51.     **Predominance of Common Questions of Law and Fact – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).** Common questions of law and fact exist as to all class members and predominate over any questions affecting only individual class members. These common legal and factual questions include, but are limited to, the following:

a.   Whether P&G made the "MAX STRENGTH" representations;

b.   Whether P&G promoted the Products with false and misleading statements of fact and material omissions;

c.   Whether P&G's "MAX STRENGTH" representations are deceptive, unfair, or

---

1, *et seq*.); New York (N.Y. Gen. Bus. Law §§ 349, *et seq*.); Washington (Wash. Rev. Code §§ 19.86.010, *et seq*.); *See Mullins v. Direct Digital, LLC*, No. 13-cv-1829, 2014 WL 5461903 (N.D. Ill. Sept. 30, 2014), *aff'd*, 795 F.3d 654 (7th Cir. 2015).

misleading to the reasonable consumer;

d. Whether P&G's actions and/or omissions violate applicable laws;

e. Whether Plaintiff and putative members of the Classes have suffered loss of monies or property or other value as a result of P&G's acts, omissions, or misrepresentations of material facts;

f. Whether P&G was unjustly enriched at the expense of Plaintiff and members of the putative Classes in connection with the Products;

g. Whether P&G breached warranties owed to Plaintiff and members of the putative Classes;

h. Whether Plaintiff and members of the putative Classes are entitled to monetary damages and, if so, the nature of such relief; and

i. Whether Plaintiff and members of the putative Classes are entitled to equitable, declaratory, or injunctive relief and, if so, the nature of such relief.

52.      **Typicality – Federal Rule of Civil Procedure 23(a)(3).** Plaintiff's claims are typical of those of the absent class members in that Plaintiff and the class members each purchased and used the Products and each sustained damages arising from P&G's wrongful conduct, as alleged more fully herein. Plaintiff shares the aforementioned facts and legal claims or questions with putative members of the Classes, and Plaintiff and all members of the putative Classes have been similarly affected by P&G's common course of conduct alleged herein. Plaintiff and all members of the putative Classes sustained monetary and economic injuries including, but not limited to, ascertainable loss arising out of P&G's false and deceptive "MAX STRENGTH" representations about the Products, as alleged herein.

53.      **Adequacy – Federal Rule of Civil Procedure 23(a)(4).** Plaintiff will fairly and

19

adequately represent and protect the interests of the members of the putative Classes. Plaintiff has retained counsel with substantial experience in handling complex class action litigation, including complex questions that arise in this type of consumer protection litigation. Further, Plaintiff and his counsel are committed to the vigorous prosecution of this action. Plaintiff does not have any conflicts of interest or interests adverse to those of putative Classes.

54.     **Declaratory and Injunctive Relief – Federal Rule of Civil Procedure 23(b)(2).** P&G has acted or refused to act on grounds generally applicable to Plaintiff and all members of the Classes, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the members of the Classes as a whole.

55.     **Superiority – Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available methods for the fair and efficient adjudication of the present controversy for at least the following reasons:

a.   The damages suffered by each individual member of the putative Classes do not justify the burden and expense of individual prosecution of the complex and extensive litigation necessitated by P&G's conduct;

b.   Even if individual members of the Classes had the resources to pursue individual litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed;

c.   The claims presented in this case predominate over any questions of law or fact affecting individual members of the Classes;

d.   Individual joinder of all members of the Classes is impracticable;

e.   Absent a class, Plaintiff and members of the putative Classes will continue to suffer harm as a result of P&G's unlawful conduct; and

f.   This action presents no difficulty that would impede its management by the Court as a class action, which is the best available means by which Plaintiff and members of the putative Classes can seek redress for the harm caused by P&G.

## CLAIMS FOR RELIEF

### COUNT I
### VIOLATION OF ILLINOIS CONSUMER FRAUD
### AND DECEPTIVE BUSINESS PRACTICES ACT
### (By Plaintiff on Behalf of the Illinois Subclass)

56.   Plaintiff realleges paragraphs 1-55 above as if fully set forth herein.

57.   Plaintiff brings this claim on behalf of himself and the Illinois Subclass.

58.   The Illinois Consumer Fraud and Deceptive Business Practices Act (the "ICFA"), 815 ILCS 505/1, *et seq.*, prohibits "unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact or the use or employment of any practice described in Section 2 of the 'Uniform Deceptive Trade Practices Act' . . . ."

59.   Plaintiff and the Illinois Subclass members were injured by P&G's deceptive misrepresentations, concealments and omissions and these misrepresentations, concealments and omissions were material and deceived Plaintiff and the Illinois Subclass. Because Plaintiff and the Illinois Subclass members relied on P&G's misrepresentations, concealments and omissions when purchasing the Products, they were injured at the time of purchase.

60.   P&G does business in Illinois, sells and distributes the Products in Illinois, and engaged in deceptive acts and practices in connection with the sale of the Products in Illinois and elsewhere in the United States.

21

61.     The Products purchased by Plaintiff and the Illinois Subclass members were "consumer items" as that term is defined under the ICFA.

62.     P&G engaged in unfair and deceptive acts in violation of 815 Ill. Comp. Stat. 505/2 when it misrepresented and deceptively concealed, suppressed and/or omitted the material information known to P&G as set forth above concerning its Products, which has caused damage and injury to Plaintiff and the Illinois Subclass members. Plaintiff and the Illinois Subclass members were injured by P&G's unfair and deceptive acts at the time of purchasing the Products.

63.     P&G's marking of the Products violates this prohibition by deceiving consumers into believing each of the Products is a "MAX STRENGTH" decongestant or pain reliever/fever reducer.

64.     P&G engaged in fraudulent and/or deceptive conduct, which creates a likelihood of confusion or of misunderstanding in violation of the Act.

65.     P&G engaged in misleading and deceptive advertising that represented that the Products were maximum strength. P&G chose to package and market the products in this way to impact consumer choices and gain market dominance, as it knew or should have known that all consumers who purchased the products would be impacted by its omissions and would reasonably believe P&G's false and misleading Maximum Strength Representations and omissions.

66.     P&G's deceptive acts occurred in a course of conduct involving trade and commerce in Illinois and throughout the United States.

67.     P&G intended Plaintiff and the Illinois Subclass members to rely on its deceptive acts when purchasing the Products.

68.     P&G's deceptive acts proximately caused actual injury and damage to Plaintiff and the Illinois Subclass members at the time of purchase.

69.     Plaintiff and the Illinois Subclass members would not have purchased, or would have paid less for, the Products but for P&G's material misrepresentations as described in this Complaint.

## COUNT VI
## VIOLATION OF ILLINOIS UNIFORM DECEPTIVE TRADE PRACTICES ACT
### (By Plaintiff on Behalf of the Illinois Subclass)

70.     Plaintiff realleges paragraphs 1-55 above as if fully set forth herein.

71.     Plaintiff brings this claim on behalf of himself and the Illinois Subclass.

72.     The Illinois Deceptive Trade Practices Act ("UDTPA"), 815 ILCS 510/2, *et seq*., prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact."

73.     815 ILCS 510/2 provides in pertinent part that a "person engages in a deceptive trade practice when, in the course of his or her business, vocation, or occupation," the person does any of the following: "(5) represents that goods or services have . . . uses, benefits or quantities that they do not have . . .; (7) represents that goods or services are of a particular standard, quality, or grade or that goods are a particular style or model, if they are of another; . . . [or] (12) engages in any other conduct which similarly creates a likelihood of confusion or misunderstanding."

74.     P&G's marking of the Products violates this prohibition by deceiving consumers into believing each of the Products is a "MAX STRENGTH" decongestant or pain reliever/fever reducer.

75.     P&G engaged in fraudulent and/or deceptive conduct, which creates a likelihood of confusion or of misunderstanding in violation of the Act.

76.     P&G engaged in misleading and deceptive advertising that represented that the Products were maximum strength. P&G chose to package and market the Products in this way to impact consumer choices and gain market dominance, as it knew or should have known that all consumers who purchased the Products would be impacted by its omissions and would reasonably believe P&G's false and misleading Maximum Strength Representations and omissions.

77.     P&G intended that Plaintiff and each of the other Illinois Subclass members would reasonably rely upon the material omissions concerning the true nature of the Products.

78.     P&G's concealment, omissions, and other deceptive conduct were likely to deceive and cause misunderstanding and/or in fact caused Plaintiff and each of the other Illinois Subclass members to be deceived about the true nature of the Products.

79.     P&G's deceptive acts occurred in a course of conduct involving trade and commerce in Illinois and throughout the United States.

80.     P&G's deceptive acts proximately caused actual injury and damage to Plaintiff and the Illinois Subclass Members at the time of purchase.

81.     Plaintiff and the Illinois Subclass Members would not have purchased, or would have paid less for, the Products but for P&G's material misrepresentations as described in this Complaint.

82.     P&G intended Plaintiff and the Illinois Subclass members to rely on its deceptive acts when purchasing the Products.

## COUNT III
## VIOLATION OF STATE CONSUMER PROTECTION STATUTES
### (By Plaintiff on Behalf of the Multi-State Consumer Protection Class)

83.     Plaintiff realleges paragraphs 1-55 as if fully set forth herein.

84.     Plaintiff brings this cause of action on behalf of himself and the Multi-State

Consumer Protection Class.

85.     Plaintiff and Multi-State Consumer Protection Class members have been injured as a result of P&G's violations of the state consumer protection statutes listed above in paragraph 47 and footnote 6, which also provide a basis for redress to Plaintiff and Multi-State Consumer Class Members based on P&G's fraudulent, deceptive, unfair and unconscionable acts, practices and conduct.

86.     P&G's conduct as alleged herein violates the consumer protection, unfair trade practices, and deceptive acts laws of each of the jurisdictions encompassing the Multi-State Consumer Class.

87.     P&G violated the Multi-State Consumer Class states' consumer protection, unfair trade practices, and deceptive acts laws through its misleading and deceptive advertising that represented the Products were "MAX STRENGTH." P&G chose to package and market the Products in this way to impact consumer choices and gain market dominance, as it knew or should have known that all consumers who purchased the Products would be impacted by its omissions and would reasonably believe P&G's false and misleading Maximum Strength Representations and omissions.

88.     P&G's misrepresentations were material to Plaintiff and Multi-State Consumer Class members' decision to purchase the Products or pay a premium for the Products.

89.     P&G made its untrue and/or misleading statements and representations willfully, wantonly, and with reckless disregard for the truth.

90.     As a result of P&G's violations of the aforementioned states' unfair and deceptive practices laws, Plaintiff and Multi-State Consumer Class members paid a premium for the Products.

91.     As a result of P&G's violations, P&G has been unjustly enriched.

92.     Pursuant to the alleged consumer protection, unfair trade practices, and deceptive acts laws, Plaintiff and Multi-State Consumer Class members are entitled to recover compensatory damages, restitution, punitive and special damages, including but not limited to statutory or treble damages, reasonable attorneys' fees, and costs, and other injunctive or declaratory relief as deemed appropriate or permitted pursuant to the relevant law.

**COUNT IV**
**UNJUST ENRICHMENT**
**(By Plaintiff, In the Alternative, and on Behalf of the Nationwide and/or Illinois Subclass)**

93.     Plaintiff realleges paragraphs 1-55 above as if fully set forth herein.

94.     Plaintiff brings this cause of action on behalf of himself, the Nationwide Class, and/or the Illinois Subclass. It is alleged it the alternative to the extent there is no adequate remedy at law.

95.     Plaintiff and the putative class members conferred a benefit on P&G when they purchased the Products. By its wrongful acts and omissions described herein, including selling the Products containing the "MAX STRENGTH" representations, which did not conform to the promises or affirmations of fact made on the label, P&G was unjustly enriched at the expense of Plaintiff and the putative class members.

96.     Plaintiff's and the putative class members' detriment and P&G's enrichment were related to and flowed from the wrongful conduct challenged in this Complaint.

97.     P&G has profited from its unlawful, unfair, misleading, and deceptive practices at the expense of Plaintiff and the putative class members under circumstances in which it would be unjust for P&G to be permitted to retain the benefit. It would be inequitable for P&G to retain the profits, benefits, and other compensation obtained from their wrongful conduct as described herein in connection with selling the Products.

98.     P&G has been unjustly enriched in retaining the revenues derived from class members' purchases of the Products, which retention of such revenues under these circumstances is unjust and inequitable because P&G marketed, advertised, distributed, and sold the Products, and P&G misrepresented the nature of the products, misrepresented their benefits and attributes, and knowingly marketed and promoted the Products with Maximum Strength Representations, which caused injuries to Plaintiff and the Classes because they would not have purchased the Products based on the same representations if the true facts concerning the Products had been known.

99.     Plaintiff and the putative class members have been damaged as a direct and proximate result of P&G's unjust enrichment because they would not have purchased the Products on the same terms or for the same price had they known the true nature of the Products and the misstatements regarding the strength of the Products' active ingredients.

100.    P&G either knew or should have known that payments rendered by Plaintiff and the class members were given and received with the expectation that the Maximum Strength Representations made by P&G in advertising and on the Products' labels and packaging were true. It is inequitable for P&G to retain the benefit of payments under these circumstances because the Maximum Strength Representations are not true.

101.    Plaintiff and the putative class members are entitled to recover from P&G all amounts wrongfully collected and improperly retained by P&G.

102.    As a direct result of P&G's wrongful conduct and unjust enrichment, Plaintiff and the putative class members are entitled to restitution of, disgorgement of, and/or imposition of a constructive trust upon all profits, benefits, and other compensation obtained by P&G for their inequitable and unlawful conduct.

<u>COUNT V</u>
<u>Breach of Express Warranty</u>
<u>(By Plaintiff, In the Alternative, and on Behalf of the Nationwide and/or Illinois Subclass)</u>

103.    Plaintiff realleges paragraphs 1-55 above as if fully set forth herein.

104.    Plaintiff and class members purchased the Products through P&G's authorized retailers.

105.    Plaintiff and class members formed a contract with P&G at the time Plaintiff and class members purchased the Product.

106.    The terms of the contract include the promises and affirmations of fact made by P&G on the Product packaging and through marketing and advertising, as described above.

107.    This labeling, marketing, and advertising constitute express warranties and became part of the basis of the bargain and are part of the standardized contract between Plaintiff and class members.

108.    P&G made the representations described herein to induce Plaintiff and class members to purchase the Products, and Plaintiff and class members relied on the representations in purchasing the Products.

109.    All conditions precedent to P&G's liability under the above-referenced contract have been performed by Plaintiff and the other class members.

110.    P&G thereby breached the following state warranty laws:

    a.    Code of Ala. § 7-2-313;

    b.    Alaska Stat. § 45.02.313;

    c.    A.R.S. § 47-2313;

    d.    A.C.A. § 4-2-313;

    e.    Cal. Comm. Code § 2313;

    f.    Colo. Rev. Stat. § 4-2-313;

g.      Conn. Gen. Stat. § 42a-2-313;

h.      6 Del. C. § 2-313;

i.      D.C. Code § 28:2-313;

j.      Fla. Stat. § 672.313;

k.      O.C.G.A. § 11-2-313;

l.      H.R.S. § 490:2-313;

m.      Idaho Code § 28-2-313;

n.      810 I.L.C.S. 5/2-313;

o.      Ind. Code § 26-1-2-313;

p.      Iowa Code § 554.2313;

q.      K.S.A. § 84-2-313;

r.      K.R.S. § 355.2-313;

s.      11 M.R.S. § 2-313;

t.      Md. Commercial Law Code Ann. § 2-313;

u.      106 Mass. Gen. Laws Ann. § 2-313;

v.      M.C.L.S. § 440.2313;

w.      Minn. Stat. § 336.2-313;

x.      Miss. Code Ann. § 75-2-313;

y.      R.S. Mo. § 400.2-313;

z.      Mont. Code Anno. § 30-2-313;

aa.      Neb. Rev. Stat. § 2-313;

bb.      Nev. Rev. Stat. Ann. § 104.2313;

cc.      R.S.A. 382-A:2-313;

dd.    N.J. Stat. Ann. § 12A:2-313;

ee.    N.M. Stat. Ann. § 55-2-313;

ff.    N.Y. U.C.C. Law § 2-313;

gg.    N.C. Gen. Stat. § 25-2-313;

hh.    N.D. Cent. Code § 41-02-30;

ii.    II. O.R.C. Ann. § 1302.26;

jj.    12A Okl. St. § 2-313;

kk.    Or. Rev. Stat. § 72-3130;

ll.    13 Pa. Rev. Stat. § 72-3130;

mm.    R.I. Gen. Laws § 6A-2-313;

nn.    S.C. Code Ann. § 36-2-313;

oo.    S.D. Codified Laws, § 57A-2-313;

pp.    Tenn. Code Ann. § 47-2-313;

qq.    Tex. Bus. & Com. Code § 2.313;

rr.    Utah Code Ann. § 70A-2-313;

ss.    9A V.S.A. § 2-313;

tt.    Va. Code Ann. § 59.1-504.2;

uu.    Wash. Rev. Code Ann. § 6A.2-313;

vv.    W. Va. Code § 46-2-313;

ww.    Wis. Stat. § 402.313; and

xx.    Wyo. Stat. § 34.1-2-313.

111.    In connection with its sale of the Products, P&G, as the designer, manufacturer, marketer, distributor or seller, expressly warranted that the Products were maximum strength

30

through its use of the Maximum Strength Representations described herein.

112.    The express warranties covering the Products were a material part of the bargain between P&G and consumers. At the time it made these express warranties, P&G knew reasonable consumers were purchasing the Products because they believed they were maximum strength oral nasal decongestant products and pain reliever/fever reducers, as they were labeled and marketed.

113.    Each of the Products have an identical or substantially identical product representation(s) as they each contain the term "MAX STRENGTH" in their product name. Furthermore, the Products are marketed and advertised in an identical or substantially identical way.

114.    P&G breached its express warranties by selling the Products that were, in actuality, not maximum strength oral nasal decongestant products and pain relievers/fever reducers. P&G breached the warranty because it sold the Products which it labeled and marketed using the Maximum Strength Representations despite the fact that stronger over-the-counter alternatives existed, which was known to P&G and unknown to consumers at the time of sale.

115.    P&G further breached its express written warranties to Plaintiff and class members in that the Products are incapable of fulfilling their promise to function as maximum strength oral nasal decongestant products and pain relievers/fever reducers at the time they leave the manufacturing plant and on the first day of purchase, and by failing to disclose and actively concealing the true benefits of the Products from consumers.

116.    The Products that Plaintiff and class members purchased are not maximum strength oral nasal decongestant products and pain reliever/fever reducers, and thus Plaintiffs and class members suffered the loss of the product, loss of use of the product, and loss of the

benefit of their bargain. P&G's warranty expressly applies to the original purchaser, creating privity between P&G on the one hand, and Plaintiff and class members on the other.

117.     Likewise, it was reasonably foreseeable that Plaintiff and Class Member would be the intended beneficiaries of the Products, creating privity or an exception to any privity requirement. Plaintiff and each of the class members are the intended beneficiaries of P&G's warranties and its sale through retailers. The retailers were not intended to be the ultimate consumers of the Products and have no rights under the warranty agreements provided by P&G. P&G's warranties were designed for and intended to benefit the consumer only and Plaintiff and class members were the intended beneficiaries of the Products.

118.     P&G has been provided sufficient notice of its breaches of the express warranties associated with the Products in a letter dated November 27, 2023.

119.     As a direct and proximate result of P&G's breach of its express warranties, Plaintiff and Class Members suffered, and continue to suffer, financial damage and injury, and are entitled to all damages, in addition to costs, interest and fees, including attorneys' fees, as allowed by law.

**<u>COUNT VI</u>**
**<u>Breach of Implied Warranty</u>**
**<u>(By Plaintiff, In the Alternative, and on Behalf of the Nationwide and/or Illinois Subclass)</u>**

120.     Plaintiff realleges paragraphs 1-55 above as if fully set forth herein.

121.     P&G is a merchant and was at all relevant times involved in the manufacturing, distributing, warranting, and/or selling of the Products.

122.     The Products are goods within the relevant laws and P&G knew or had reason to know of the specific use for which the Products, as goods, were purchased.

123.     The implied warranty of merchantability included with the sale of each Product

means that P&G warranted that the Products would be fit for the ordinary purposes for which the Products were used and sold, and were not otherwise injurious to consumers, that the Products would pass without objection in the trade, be of fair and average quality, and conform to the promises and affirmations of fact made by P&G. This implied warranty of merchantability is part of the basis for the benefit of the bargain between P&G, and Plaintiff, and class members.

124.    Defendant breached the implied warranty of merchantability because the Products are not fit for their ordinary purpose as a maximum strength nasal decongestant and pain reliever/fever reducer. As further alleged herein, stronger over-the-counter alternatives existed, and therefore, there is a breach of the implied warranty of merchantability.

125.    P&G's warranty expressly applies to the original purchaser and any succeeding owner of the Products, creating privity between P&G on the one hand, and Plaintiff and class members on the other.

126.    Nonetheless, privity is not required because Plaintiff and class members are the intended beneficiaries of P&G's warranties and its sale through retailers. P&G's retailers were not intended to be the ultimate consumers of the Products and have no rights under the warranty agreements. P&G's warranties were designed for and intended to benefit the consumer only and Plaintiff and class members were their intended beneficiaries.

127.    Likewise, it was reasonably foreseeable that Plaintiff and class members would be the intended beneficiaries of the Products and warranties.

128.    P&G impliedly warranted that the Products were of merchantable quality and fit for such use. These implied warranties included, among other things: (i) a warranty that the Products manufactured, supplied, distributed, and/or sold by P&G were maximum strength nasal

decongestants and pain relievers/fever reducers; and (ii) a warranty that the Products would be fit for their intended use while they were being used by consumers.

129.    Contrary to the applicable implied warranties, the Products, at the time of sale and thereafter, were not fit for their ordinary and intended purpose of providing Plaintiff and class members with maximum strength nasal decongestants and pain reliever/fever reducers, as other, stronger alternatives are available with stronger active ingredients, such as pseudoephedrine and with higher acetaminophen dosages.

130.    P&G breached the implied warranties because the Products were sold with the inability to provide Plaintiff and class members with a maximum strength nasal decongestant and pain reliever/fever reducers, which substantially reduced and/or prevented the Products from functioning as maximum strength product.

131.    As a direct and proximate result of the foregoing, Plaintiff and class members suffered, and continue to suffer, financial damage and injury, and are entitled to all damages, in addition to costs, interest and fees, including attorneys' fees, as allowed by law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated members of the Classes, prays for relief and judgment, including entry of an order:

A.    Declaring that this action is properly maintained as a class action, certifying the proposed Classes, appointing as Class Representative and appointing Plaintiff's counsel as Class Counsel;

B.    Directing that P&G bear the costs of any notice sent to the Classes;

C.    Declaring that P&G must disgorge, for the benefit of the Classes, all or part of the ill-gotten profits they received from the sale of the Products, or order P&G to

make full restitution to Plaintiff and the members of the Classes;

D.      Awarding restitution and other appropriate equitable relief;

E.      Granting an injunction against P&G to enjoin it from conducting its business through the unlawful, unfair, and fraudulent acts or practices set forth herein;

F.      Granting an Order requiring P&G to fully and appropriately recall the Products and/or to remove the claims on its website and elsewhere, including "MAX STRENGTH" representations regarding the Products;

G.      Ordering a jury trial and damages according to proof;

H.      Awarding Plaintiff and members of the Classes compensatory and punitive damages, or statutory damages, as provided by the applicable state consumer protection statutes invoked above;

I.      Enjoining P&G from continuing to engage in the unlawful and unfair business acts and practices as alleged herein;

J.      Awarding attorneys' fees and litigation costs to Plaintiff and members of the Class(es);

K.      Awarding civil penalties, prejudgment interest, and punitive damages as permitted by law; and

L.      Ordering such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

 Plaintiff demands a trial by jury of all claims in this Complaint so triable.

Dated: January 5, 2024                    Respectfully submitted,

By:  */s/ Nick Suciu III*

Nick Suciu III
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN, PLLC**
6905 Telegraph Rd., Suite 115
Bloomfield Hills, MI 48301
Telephone: (313) 303-3472
Email: nsuciu@milberg.com

Gary M. Klinger
**MILBERG COLEMAN BRYSON PHILLIPS**
**GROSSMAN, PLLC**
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
Telephone: (866) 252-0878
Email: gklinger@milberg.com

Jeff Ostrow
Jonathan M. Streisfeld
Kristen Lake Cardoso
**KOPELOWITZ OSTROW P.A.**
One West Las Olas Blvd., Suite 500
Fort Lauderdale, Florida 33301
Telephone: (954) 525-4100
Email:  ostrow@kolawyers.com
           streisfeld@kolawyers.com
           cardoso@kolawyers.com

Melissa S. Weiner
Ryan J. Gott
**PEARSON WARSHAW, LLP**
328 Barry Avenue South, Suite 200
Wayzata, Minnesota 55391
Telephone: (612) 389-0600
Email: mweiner@pwfirm.com
           rgott@pwfirm.com

Erin Ruben
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN PLLC**
900 W. Morgan Street
Raleigh, NC 27603
Telephone: (919) 600-5000
Email: eruben@milberg.com

36

J. Hunter Bryson
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN, PLLC**
405 E 50th Street
New York, NY 10022
Telephone: (630) 796-0903
Email: hbryson@milberg.com

*Attorneys for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on January 5, 2024 the foregoing document was filed via the Court's ECF system, which will cause a true and correct copy of the same to be served electronically on all ECF-registered counsel of record.


*/s/ Nick Suciu III*
Nick Suciu III
